```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
v.                       )         Criminal No. 17-10181-IT
                         )
                         )
ANDRE PARHAM-RANKIN      )
```

### GOVERNMENT'S SENTENCING MEMORANDUM

On July 24, 2017, counsel in this case consummated a plea agreement that had been the subject of careful negotiation and provided the defendant with certainty regarding his sentence. If accepted by this Court, the defendant will remain under criminal justice system supervision for nine years (i.e., 36 months' incarceration *plus* the mandatory six years of supervised release).

The government urges the Court to accept the agreed-upon disposition in the parties' plea agreement and sentence the defendant to 36 months plus 6 years of supervised release.

The proposed sentence is below the 37-46 month guideline range calculated in the Presentence Report ("PSR"). PSR at ¶102. It attempts to balance the seriousness of the offenses of conviction (that include both drug and firearm offenses) with the defendant's youth and limited adult criminal history. See PSR at ¶49 (2015 CWOF for carrying a folding knife only adult

1

conviction).1  In the circumstances, the government believes that the three-year sentence is an appropriate disposition in this case particularly when accompanied by the mandatory six-year period of supervised release.

## PROPOSED JUDICIAL RECOMMENDATIONS

Any plan designed to give the defendant the maximum chance at positive life change must of course begin with the terms and conditions of his incarceration. E.g., United States v. Gautier, 590 F. Supp. 2d 214 (D. Mass. 2008) ("I have required Probation to devise a recommended plan for him, both as a recommendation for the Bureau of Prisons during the period of his incarceration and as a template for his supervised release afterwards. Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry. Laurie Robinson & Jeremy Travis, 12 Fed. S.R. 258 (2000)").  The government is requesting that the Court make the following recommendations to the Bureau of Prisons: (i) that the defendant be given any available substance abuse treatment; (ii) that the defendant be given any available mental health treatment (including, without limitation any available treatment for anger management); and,

---

1 The defendant does have three determinations of delinquency as described in the PSR.

(iii) that the defendant be given any available vocational training (so that the defendant may have maximum job skills when he is released).

## **SUPERVISED RELEASE CONDITIONS**

The plea agreement calls for a period of 6 years of supervised release. It is hoped that this period will be sufficient to provide Probation with ample time to assist the defendant once he is released particularly with respect to overcoming his longstanding substance abuse, anger management, and mental health issues. If the defendant is unable to comply with his supervised release conditions once he is back out on the street, the Court would have the ability to extend the applicable supervised release period under 18 U.S.C. §3583.

In many respects, the government believes the supervised release conditions are just as important as the period of incarceration in this case. As is demonstrated in both the PSR and the Affidavit of Detective Greg Brown attached as Exhibit 1, a critical goal of the underlying investigation was to provide relief to the beleaguered residents of the Orchard Gardens Development whose quality of life was adversely affected by groups of young males (many of whom, including the defendant here, who are associated with the Orchard Park Trailblazers and

3

other area gangs) who hang around the development selling drugs, using drugs and alcohol, and literally taking over portions of the Development.  See PSR at ¶¶8-9 (describing the concentration of crime inside the development and the impact of large numbers of youth hanging around Development).  See also Brown Affidavit at ¶ ¶ 14-22 (same).  Also see maps and photographs attached to Brown Affidavit as Exhibits 2 and 3 depicting concentration of crime at Orchard Park and photographs of youth inside the Development.  It is the government's belief that keeping the Defendant and the other Targets to the investigation out of the development will both enhance public safety and the quality of life for the many innocent residents of the Development and assist the defendant in changing his behavior by eliminating places and persons that have lead him to make bad decisions in the past and that that could place him back in prison for much longer periods of time in the future.

In many respects, the defendant is emblematic of what the underlying investigation was all about.  He sold crack cocaine in 2016 to the CW (a total stranger) inside the Development. See PSR at ¶16-20.  And when he was arrested in 2017 (also inside the Development), police recovered two guns, cash, drug paraphernalia and a half kilo of marijuana from his bedroom.

Important additional information about the defendant's abuse of the Orchard Gardens Development comes from both the Brown affidavit and the Summary of BPD Reports attached as Exhibit 2.[2] These show that the defendant as one of the individuals who has consistently been hanging out in Orchard Gardens (often in the company of other Targets to this investigation, many of whom have already pled guilty to selling drugs inside the development as well. See Brown Affidavit at ¶30 (30 FIOs inside the Development); PSR at¶ 12 (Defendant has interacted with the police inside the Development with nine of the targets to the investigation) Summary of BPD Reports at page 8n (Defendant stopped inside Development in the company of Jose Quinones and Dontane Bryant, both of whom have been convicted of federal drug or gun offenses); 9 (Defendant shot at the intersection of Dudley and Greenville Streets) 12 (defendant

---

[2] The government notes that, in the recent case of United States v. Cortes-Medina, 819 F.3d 566 (1st Cir. 2016), the First Circuit expressed concern over a sentencing court's reliance on a "record of multiple arrests and charges without convictions unless there is adequate proof of the conduct upon which the arrest or charges were predicated."819 F.3d at 570.  Here, the government is not relying on the mere fact of arrests that did not mature into convictions but rather only on the location of arrests and other interactions the Defendant has had with the police in the area of Orchard Gardens that are also supported by contemporaneous police reports in support of certain special conditions of supervised release described more fully below.

arrested in Development for A&B; police recover crack from transport and knife from Defendant);13 (Defendant is part of group hanging out at 45 Mt. Pleasant Street [several blocks from Development but within proposed exclusion zone] at 1:00a.m. with group; police recover gun hidden behind tire after group disperses); 14 (Defendant and second male flee from police inside Orchard Gardens; crack recovered from second male). Hence, removing the defendant from the area of the Development will help enhance public safety and help protect the defendant from himself. Indeed, the defendant has himself recognized the need for him to get away from the area of the Development. See PSR at 63 (defendant believes that returning to mother's residence would not be beneficial to him).[3]

Accordingly, in addition to the length of supervised release provided for in the plea agreement, the government is asking that the Court impose the following special conditions to both assist the defendant and help protect public safety:

**A. Drug testing**. Defendant shall submit to a drug test within 14 days after his release from custody and to such additional drug tests (not to exceed 104 per year) as Probation

---

[3] The PSR also indicates that the defendant's mother lives in subsidized housing. PSR at ¶ 63.

believes may be required during the entire period of supervised release. PSR at ¶ ¶ 81-86 (substance abuse history). He should also be reminded that, while marijuana may be legal at some point in the future, it is still illegal under federal law.

**B.  Drug and Mental Health counseling**.  Defendant shall be required to participate in any drug or mental health treatment required by Probation (including any anger management treatment Probation considers appropriate) and shall be required to contribute to the cost of such treatment during the period of Supervised Release. See PSR at ¶¶76-80(mental and emotional health).

**C. Residence.** First 6 months in a Residential Re-entry Center ("RRC") outside the exclusion zone *if* (and only if) Defendant doesn't have a residence approved by Probation at his release. See PSR at ¶ 63 (home assessment is still pending). Stay in RRC until he gets an approved residence; Defendant must comply with the rules of the facility while living there.

**D. Curfew.**  First 6 months on the street (after release from the RRC), a curfew from 9pm-6am enforced by electronic monitoring which can be adjusted for work or school by Probation.

**E. MRT.** Attend MRT (or any other cognitive behavioral

program) as directed by Probation.

**F. CARE/Restart.** Recommendation for one of these programs.

**G. Geographic/Associational Restriction.** As noted, the government believes that it is critically important to keep the defendant away from the area of the Development (where the offenses of conviction took place and where the defendant has been shot and had other interactions with Law Enforcement). The government is therefore proposing the Restrictions attached as Exhibit 3 that will keep the defendant away from areas and companions who have contributed to his historic offending and thereby both enhance public safety and help protect the defendant from running into new opportunities to commit crime.

The rationale for such restrictions has been explained as follows:

> Recidivism is due to offenders' retaining criminogenic motivation or propensity and their having access to opportunities for crime.  Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime.  *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

Cullen et al, "Environmental Corrections "A New Paradigm for Effective Probation and Parole Supervision" 66 Federal Probation

28 (2002) (hereinafter referred to as "Cullen")(emphasis supplied).  Because both the literature and common sense show that opportunities for crime will be presented whenever a Defendant returns to a high crime area in which his offending began and grew (and in which his street credentials and sense of self may have been based on that very criminality), removing him from that area can reduce both the opportunities for further crime and the expectation from those around him that he will re-offend.  Thus, "[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . . reduce the extent to which offenders are tempted by and come into contact with opportunities for crime." Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so when they are presented with opportunities to offend easily."); Dickey et al, "Promoting Public Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, May 2004, at 61-62 ("when offenders first

reenter communities, they themselves are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental health problems, lack of family connections, drug and alcohol addictions, lack of education and employment. . .Fixing these problems is often implausible. . . .Instead, we can alter environments [and] remove temptations. . . ").

As commonsensical as these notions are, effective implementation is equally straightforward. The literature suggests that narrow restrictions are more effective- restrictions precluding the Defendant from being with particular, identified people or specifically delineated areas that the record shows have previously led him into crime. Cullen at 33 (recommending that probation officers attempt "to disrupt routine activities that increase crime opportunities" that are based on the Defendant's past offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders) and "prohibiting traveling on specific streets" (e.g., areas of past criminality outlined on a map given to the offender). That is exactly what the government seeks to do here.[4]

---

[4] Appellate courts have routinely upheld such restrictions as a condition of probation or supervised release whenever, as here, the restriction served as a deterrent to protect the victimized community and/or rehabilitate the Defendant based on his prior offending. See United States v. Garrasteguy, 559 F.3d 34 (1st

---

Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on Defendant who sold drugs at Bromley Heath Housing Development); United States v. Watson, 582 F.3d 974 (9th Cir. 2009)(validating restriction that prevented Defendant from entering city and county of San Francisco without the prior approval of his Probation Officer); United States v. Cothran, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented Defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia, because his return to a high-crime neighborhood in southeast Atlanta would likely result in his continued criminal activity and the endangerment of neighborhood youth); United States v. Sicher, 239 F.3d 289, 292 (3d Cir. 2000) (upholding a supervised release restriction, after various drug convictions, that covered two counties in the Allentown, Pennsylvania, area because the "territorial limitation [was] clearly intended to promote [Defendant's] rehabilitation by keeping [Defendant] away from the influences that would most likely cause her to engage in further criminal activity"). In approving the much broader geographic restriction imposed in Garrasteguy, the First Circuit described the legal framework for such conditions as follows:

> District courts have significant flexibility to impose special conditions of supervised release.  A district court may impose as a condition of supervised release most discretionary conditions identified in 18 U.S.C. § 3563(b), or any other condition the court deems appropriate. All such conditions, however, must be "reasonably related" to the factors set forth in § 3553(a), may involve "no greater deprivation of liberty than reasonably necessary" to achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), (viz. to protect the public and promote the rehabilitation of the Defendant), and must be consistent with any pertinent policy statement of the United States Sentencing Commission. 18 U.S.C. § 3583(d); see also United States v. York, 357 F.3d 14, 20 (1st Cir.2004).

559 F.3d at 41 (footnotes omitted).  A court should also explain the reason for imposing the conditions and, in doing so, discuss how they relate to the statutory sentencing factors contained in 18 U.S.C. §3553.  See United States v. Thompson, 777 F.3d 368, 373-74 (7th Cir. 2015).

11

## CONCLUSION

Based on the foregoing, the government requests that the Court accept the plea agreement, incarcerate the defendant for 36 months, and place him on supervised release for 6 years with the conditions noted. The government also asks that the seized firearms and ammunition be forfeited. The government does not believe that any fine is warranted. The defendant must be assessed the $100 mandatory assessment.

                          Respectfully submitted,

                          WILLIAM D. WEINREB
                          ACTING UNITED STATES ATTORNEY

By: /s/ John A. Wortmann, Jr.
     JOHN A. WORTMANN, JR.
     Assistant U.S. Attorney
     One Courthouse Way
     Boston, MA 02210
     617-748-3100

## CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

                          /s/ John A. Wortmann, Jr. 12-4-17
                          JOHN A. WORTMANN, JR.
                          Assistant U.S. Attorney